# United States Court of Appeals for the Federal Circuit

04-3023

MICHAEL MARTIN,

Petitioner,

v.

DEPARTMENT OF VETERANS AFFAIRS,

Respondent.

Jacqueline M. Sims, American Federation of Government Employees, AFL-CIO, of Washington, DC, argued for petitioner. With her on the brief was Mark D. Roth.

Lisa Donis, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent. With her on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director and Brian M. Simkin, Assistant Director. Of counsel were Kent G. Huntington and Thomas Fatouros.

Appealed from: The Arbitrator

# United States Court of Appeals for the Federal Circuit

04-3023

MICHAEL MARTIN,

Petitioner,

v.

DEPARTMENT OF VETERANS AFFAIRS,

Respondent.

_____

NONPRECEDENTIAL OPINION ISSUED:  April 5, 2005
PRECEDENTIAL OPINION ISSUED:  June 24, 2005
_____

Before SCHALL, DYK, and PROST, <u>Circuit Judges</u>.

DYK, <u>Circuit Judge</u>.

Petitioner Michael Martin ("Martin") challenges an arbitrator's award sustaining his demotion by the Department of Veterans Affairs ("VA").  The VA demoted Martin because he no longer satisfied the conditions of employment as a police officer, having failed to pass the psychological assessment required to carry arms.  Even accepting Martin's argument that the arbitrator may have applied an incorrect standard in reviewing the agency's decision and impermissibly shifted the burden of proof, we conclude that the arbitrator's error was harmless because there is no material factual dispute.  Petitioner has also failed to establish any violation of the relevant Office of Personnel Management regulation.  Accordingly, we affirm.

BACKGROUND

From 1994 to 2002, Martin was employed as an unarmed police officer for the VA at the West Palm Beach Medical Center. Prior to his employment with the VA, he had served as an armed military policeman for twenty years. In December 2001, Martin's employer began implementation of VA Directive 0720, "Pilot Program to Arm Department of Veterans Affairs Police Officers" ("Directive"), with plans to arm all police officers by June of 2002. As set forth in the implementing handbook, "Procedures to Arm Department of Veterans Affairs Police Officers," "[o]nly those officers who have successfully completed . . . the revised psychological assessment within the 12 months before initial firearms training, will be issued the Firearm Authorization Card. . . . Armed officers must maintain current (annual) . . . psychological assessments as a condition of continued employment as a VA police officer." VA Handbook 0720, January 24, 2000, at 8. Psychological assessments were to include "[q]uestions . . . designed to determine an officer's suitability to be issued a firearm." Id. The Handbook also required the psychological assessment to comply with the regulations of the Office of Personnel Management ("OPM"), which set forth the procedures to be used by federal agencies in requiring medical examinations and in using such examinations for the basis of personnel decisions. Id. at 9 (citing 5 C.F.R. § 309.301 et seq.)

An additional set of agency guidelines stated:

> The initial and annual medical examinations must include a psychological assessment of the applicant/officer's emotional and mental stability by a psychiatrist or psychologist. Police officer duties include personal encounters with . . . mentally ill, irrational, or disturbed persons who . . . must be handled with . . . full control of force, and unimpeded judgment. Any emotional or mental condition which could cause the applicant/officer to be a hazard to others or self during stress situations and physical altercations will disqualify.

04-3023                                        2

VA Handbook 0730, Security and Law Enforcement, August 11, 2000, at A1-A2. These guidelines further clarified that standardized psychological testing could be administered as part of the psychological assessment "only after reason to question the applicant/officer's suitability has arisen" and if the initial assessment revealed "an articulative reason to doubt that the officer is capable of performing the duties of a police officer." Id. at A2.

In April 2002, Martin underwent a psychological assessment performed by Dr. Carracher, a staff psychologist at the West Palm Beach facility, who concluded that Martin was unfit to carry a firearm. This first evaluation suffered from various alleged procedural irregularities, including inadequate prior notice. This assessment was not considered by the agency when reaching the final decision to demote Martin. It did, however, lead to negotiations between Martin's union and the VA regarding further psychological testing.

In September 2002, as a result of these negotiations, Martin voluntarily agreed to be interviewed by Dr. Burda, the Manager of Psychology at the Miami VA Medical Center, ("Dr. Burda"), in order to undergo the "psychological assessment [which] is a mandatory screening to determine whether or not Police Officers . . . are able to carry firearms." (J.A. at 297.) Although Martin refused to release his personnel records to Dr. Burda, on the grounds that knowledge of his disciplinary history might unduly influence Dr. Burda's assessment, he did discuss his disciplinary history during the course of the interview. That disciplinary history included two suspensions.

Martin's first suspension had occurred in October 1996, and was issued for failing to confiscate a knife from a homeless patient in accordance with applicable

procedures, an offense which at the time was found to have caused a "potential threat of serious harm" to fellow police officers. (Id. at 20.) Martin's second suspension, in May of 2000, had been based on a conflict with another staff member and included charges of "inappropriate conduct [and] use of insulting, or abusive language." (Id. at 70.)

Dr. Burda noted that Martin was "ambiguous about his responsibility" for the events underlying his first suspension, which "raised questions about his judgment as a police officer." (Id. at 305.) Dr. Burda also found that Martin's account of the events surrounding his second suspension "raised questions about his temperament and emotional control." (Id.)

After informing Martin that it was regular procedure to complete standardized psychological tests when there was a history of prior disciplinary action, Dr. Burda administered two such tests with Martin's consent and after receiving the appropriate authorization from the agency. Martin's results from the second test placed him in the Medium Risk level of being rated "poorly suited" for a job as a police officer in the areas of Job Performance Behaviors and Anger Management. He also had elevated scores compared to a normative sample of incumbent police officers in the areas of Substance Abuse Proclivity, Traumatic Stress, and Negative Relations. Dr. Burda's overall assessment was that "there is sufficient evidence to indicate that Mr. Martin is not psychologically suited to perform his duties as a police officer, including the carrying of firearms." (Id. at 306.)

As a result of Dr. Burda's psychological assessment, Martin received notice of his proposed demotion in October 2002. The notice stated that "Dr. Burda determined

that you failed to meet the minimum psychological requirements and did not recommend that you be approved to carry a firearm. Therefore you have failed to meet the condition of employment to remain in the position as a police officer." (Id. at 348). It further noted that Martin, as a federal employee, had "the responsibility to perform the full scope of duties of [his] assigned position [and that his] inability to carry a firearm prevents [him] from performing the official duties of [the] police officer position" and that the proposed demotion was therefore "in order to promote the efficiency of the Federal service." (Id.) The notice of proposed demotion notified Martin of his rights to reply, orally, or in writing, or both, and to submit affidavits in support of his reply, "showing why this notice is inaccurate and any other reasons why [his] demotion should not be effected." (Id. at 349.)

In his written response, Martin submitted no contrary medical evidence to challenge the validity of Dr. Burda's findings. Martin also explicitly stated, "I concede that I was not recommended to carry a firearm by Dr. Burda." (J.A. at 363.) His response did allege, without specifying, "numerous instances of the agency's failure to follow procedures outlined in policy" and requested that he be assigned a position at an equal pay grade, with adequate training, in lieu of the proposed demotion. (Id. at 364.) He stated that his past suspensions were due to problems with his previous supervisor, who "provided an antagonistic work environment," and requested that the Medical Center Director speak with his current supervisor to clarify that the situation had changed for the better. (Id.)

Martin was formally demoted the following month, with the demotion to be effective as of December 1, 2002. In his final decision letter, the Medical Center

Director specifically found that Martin's "failure to satisfactorily complete the psychological assessment prevents [him] from carrying a firearm. Therefore [he] cannot remain in the position of a police officer at this Medical Center." (Id. at 366.) The Director further stated that he had carefully considered Martin's replies along with all the evidence developed, but found that Martin's "failure to maintain a condition of employment leaves me no alternative but to remove [him] from [his] police officer position and that the penalty of demotion is appropriate and within the range of reasonableness." (Id.)

In accordance with a 1999 Memorandum of Understanding between the VA and Martin's union, to the effect that every effort would be made to find qualified positions for any officers adversely affected by the decision to arm VA police officers, Martin was assigned to the highest available position for which he was qualified: a Program Support Clerk position, two grades lower than his Lead Police Officer post. At that time, he was informed of his appeal rights to the Merit Systems Protection Board, or the alternative to pursue a negotiated grievance as set forth in his union's collective bargaining agreement. Martin opted for the grievance procedure.

Martin and his union representative initiated a Step 3 Grievance with a letter dated December 18, 2002, seeking reversal of the demotion, backpay, and other compensatory remedies, and alleging that "[a] decision to demote has been made based on flimsy conclusions, bungled processes and suspect motivation." (J.A. at 391.) The grievance alleged various contractual and regulatory violations, and focused principally on the first evaluation conducted by Dr. Carracher, claiming that "the psychological evaluation process conducted in 2002 for Mr. Martin lacked objectivity

and any semblance of regard for policy, safety, ethics or the employee's rights." (Id. at 388-89.) As noted above, the agency did not rely on this assessment in demoting Martin. With respect to Dr. Burda's assessment, the sole assessment which formed the basis for the agency's decision, Martin's principal claim was that it was "a poor evaluation conducted by a psychologist not qualified to evaluate police." (Id. at 391.)

The letter initiating the grievance procedure also included, and presented for the first time to the agency, the results of an additional psychological assessment that was undertaken at the request of the union subsequent to the agency's demotion decision. This evaluation was carried out by Dr. Bryan, a clinical psychologist in private practice whose specialty areas include Police and Forensic Psychology. The assessment consisted of a personal interview and the administration of standardized tests. In his report, Dr. Bryan raised concerns regarding the behavioral pattern indicated by Martin's earlier disciplinary actions and the test's prediction of a "high risk for future performance difficulty." (Id. at 410.) He nonetheless concluded that Martin was "fit to continue being a police officer with the added responsibility of carrying a firearm." (Id. at 409.) Dr. Bryan also suggested that further input be provided from Martin's former supervisor as to whether he would have any reservations regarding Martin's ability to perform adequately as an armed police officer.

In January 2003 Dr. Burda, at the agency's request, prepared an additional memorandum for the arbitration hearing and compared the results of his psychological evaluation with those of the evaluation conducted by Dr. Bryan. He noted that both

testing reports raised "several significant concerns" and reasserted his "serious concerns about Mr. Martin's fitness to carry firearms." (Id. at 411-12.) *

Unable to resolve his dispute through the Step 3 grievance procedure, Martin sought arbitration. At an arbitration hearing conducted in August 2003, evidence presented by the VA and the Union included, inter alia, Martin's personnel records; applicable VA policies and procedures regarding arming police officers; evidence on the professional qualifications of Drs. Burda and Bryan and the reports of their psychological assessments of Martin; and the January 2003, memorandum prepared by Dr. Burda. The arbitrator first dismissed the VA's motion to dismiss for lack of jurisdiction, noting that the agency did not have "unfettered discretion to establish job qualifications" but rather that "job qualifications must [be] reasonable, job-related, and fairly administered and evaluated." Martin v. DVA, No. 020313-06179-3 (August 23, 2003) ("Arbitrator's Decision"), slip op. at 5. On the merits, after review of the evidence, she sustained the agency's decision, stating that an agency must "be given wide latitude in determining whether a police officer is psychologically qualified to carry arms, since the consequences which would follow from an erroneous determination could be disastrous." Id. Noting the VA standards, that "[a]ny emotional or mental condition which could cause the applicant/officer to be a hazard to others or self during stress situations and physical altercations will disqualify," the arbitrator observed that "a

---

\* Dr. Burda also noted that "[g]iven these discrepancies, I would agree with Dr. Bryan's suggestion that Mr. Martin's supervisor be given significant input into the ultimate decision of whether Mr. Martin is fit for duty as a police officer." (J.A. at 412) The agency's established procedures provide no role for the input of supervisors into the psychological assessment, which under the pertinent VA Handbook "will be limited

determination that an officer is not psychologically qualified to carry such a weapon should not be set aside unless it is shown to be arbitrary and capricious [and that] [t]he union has failed to make such a showing." Id. at 5-6. The arbitrator found that the VA's reliance on Dr. Burda's assessment was "not unreasonable." Id. at 7.

Martin timely petitioned for review of the arbitrator's decision in this court. We have jurisdiction pursuant to 5 U.S.C. §§ 7121(f) and 7703. Girani v. F.A.A., 924 F.2d 237, 239 (Fed. Cir. 1991).

## DISCUSSION

An arbitrator is bound to apply the same substantive legal standards as would the Merit Systems Protection Board ("MSPB"). Cornelius v. Nutt, 472 U.S. 648, 660 (1985); Newman v. Corrado, 897 F.2d 1579, 1582 (Fed. Cir. 1990). Under 5 U.S.C. § 7121(f), we review an arbitrator's decision under the same standard used for appeals from the MSPB. Cornelius, 472 U.S. at 652; Zingg v. Dep't of the Treasury, I.R.S., 388 F.3d 839, 842 (Fed. Cir. 2004). Accordingly, the arbitrator's decision must be affirmed unless it was not supported by substantial evidence, obtained without following procedures required by law, rule, or regulation, or was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 7703(c) (2000).

I

Petitioner contends that the arbitrator erred by applying an arbitrary and capricious standard in reviewing the agency's decision and improperly shifted the burden of proof to Martin to disprove the reasonableness of the agency's action.

---

to an interview by a psychologist or psychiatrist" and, when indicated, psychological testing. VA Handbook 0730, August 11, 2000, at A-2.

Under the pertinent statute, "the decision of the agency shall be sustained . . . only if the agency's <u>decision</u> . . . is supported by a preponderance of the evidence." 5 U.S.C. § 7701(c)(1)(B) (2000) (emphasis added). The implementing regulations clarify that it is the agency's burden to establish that a preponderance of the evidence supports the agency's decision. 5 C.F.R. § 1201.56(a)(ii) (2004). Once the government meets its burden, the burden of proof then shifts to the petitioner to demonstrate by a preponderance of the evidence that there was harmful procedural error; a prohibited personnel practice occurred; or that the decision was not in accordance with law. 5 U.S.C. § 7701(c)(2); 5 C.F.R. § 1201.56 (a)(2) & (b).

OPM regulations clearly state that "[f]ailure to meet a properly established medical standard or physical requirement under this part means that the individual is not qualified for the position." 5 C.F.R. § 339.102(a) & (c) (2004). The VA Handbook provides that "[o]nly those officers who have successfully completed . . . the revised psychological assessment within the 12 months before initial firearms training, will be issued the Firearm Authorization Card. . . . Armed officers must maintain current (annual) . . . psychological assessments as a condition of continued employment as a VA police officer." VA Handbook 0720, January 24, 2000, at 8.

Petitioner does not challenge either the agency's authority to establish this standard, or the reasonableness of the standard. While petitioner urges that the agency's decision under this standard is not supported by the preponderance of the evidence and that the arbitrator impermissibly shifted the burden of proof to Martin, there is no dispute that Martin failed the psychological assessment. Dr. Burda's first evaluation, the only evaluation relied upon by the agency in reaching its demotion

decision, found Martin unfit to carry a firearm. Martin conceded that he failed the psychological assessment undertaken by Dr. Burda in his written response to the notice of proposed demotion. See Catalano v. United States Postal Serv., 23 M.S.P.R. 432, 436-37 (1984).

While the arbitrator may have applied an incorrect standard (arbitrary and capricious, rather than preponderance of the evidence), our case law is clear that it is substance, rather than form, which guides our review of arbitrators' decisions. See Girani, 924 F.2d at 242; Wissman v. Soc. Sec. Admin., 848 F.2d 176, 178 (Fed. Cir. 1988). Under these circumstances, where the agency's decision was based on Dr. Burda's review, and there is no dispute that this assessment concluded that Martin was not qualified, the arbitrator's use of an incorrect standard was harmless error.

II

We now turn to an additional question—whether Martin established an affirmative defense. In this respect, Martin claims that the agency's decision cannot be sustained due to harmful procedural error caused by the VA's failure to comply with the procedures to be used for medical examinations. 5 U.S.C. § 7701(c)(2)(A); 5 C.F.R. § 339.303 (2004).

The applicable regulation provides:

(a) When an agency orders or offers a medical examination under this subpart, it must inform the applicant or employee in writing of its reasons for doing so and the consequences of failure to cooperate. . . .

(b) The agency designates the examining physician or other appropriate practitioner, but must offer the individual an opportunity to submit medical documentation from his or her personal physician or practitioner. The agency must review and consider all such

> documentation supplied by the individual's personal physician or practitioner.

5 C.F.R. § 339.303.

This regulation requires the agency, when reaching a decision based upon the results of a medical examination, to provide an opportunity for the affected employee to introduce contrary medical evidence. Martin does not claim that he was denied notice of his rights to submit additional medical evidence, or adequate opportunity to do so. The record is clear that Martin (represented by his union) received notice of his rights to submit information, and he made no effort to submit medical evidence to the agency at any time before the agency reached its final decision, notwithstanding a gap of six months since the first, contested, psychological assessment carried out by Dr. Carracher in April 2002, and the final agency decision of November 2002. Martin failed to provide any medical evidence in his written response to the agency's proposed decision. It was only after the agency had already considered his response and reached a final demotion decision that Martin was evaluated by Dr. Bryan. Dr. Bryan's evaluation results were presented to the agency for the first time as part of the evidence accompanying his Step 3 Grievance. There was no violation of the regulation's requirement that the agency "offer the individual an opportunity to submit medical documentation from his or her personal physician or practitioner." Id.

Martin also argues that the agency violated its obligation under the regulation to "review and consider" all the medical evidence that he supplied. Id. However, Martin fails to comprehend that the regulation only requires the agency to consider medical evidence it received prior to reaching its decision. Martin did not supply this evidence to the agency. The OPM regulation does not impose an open-ended obligation upon the

agency to continually revise a final personnel decision based upon new evidence submitted by an employee, when adequate notice was provided and when that employee failed to submit the information in a timely fashion.

## CONCLUSION

For the foregoing reasons, the arbitrator's decision is

## AFFIRMED.

## COSTS

No costs.