NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**DOUGLAS EILERS,**
*Petitioner,*

**v.**

**DEPARTMENT OF THE ARMY,**
*Respondent,*

---

2010-3059

---

Petition for review of an arbitrator's decision by Ronald L. Miller.

---

Decided: January 24, 2011

---

THOMAS F. MUTHER, JR., Minahan and Muther, P.C., of Denver, Colorado, for petitioner.

ELIZABETH M. HOSFORD, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for respondent. With her on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and KIRK T. MANHARDT, Assistant Director.

---

Before NEWMAN, GAJARSA, and MOORE, *Circuit Judges*

PER CURIAM.

This case is an appeal from the decision of an arbitrator sustaining the Department of the Army, Corps of Engineers' removal of Douglas Eilers from his position based on charges of misconduct. Because substantial evidence supports the arbitrator's decision and Mr. Eilers's due process rights were not violated, we *affirm*.

BACKGROUND

Mr. Eilers was employed as a power plant operator at the Detroit Dam. On June 18, 2007, while Mr. Eilers was on duty, a ground fault occurred in the electrical system. The ground fault caused the XJ-5 and XJ-31 circuit breakers to automatically open (trip). While the Detroit Dam system experienced other ground faults in the months prior to June 2007, this ground fault was serious enough for Mr. Eilers to call Mr. Deforest Petersdorf, an electrician, and Mr. Joseph Shindelus, the maintenance foreman, and request they come to the Detroit Dam to help analyze the problem.

Upon arrival, Mr. Petersdorf and Mr. Eilers investigated the problem. Together they concluded that the XJ-5 circuit breaker should be closed to see whether it would trip again. Mr. Eilers closed the XJ-5 breaker, and almost immediately the ground fault alarm sounded. Mr. Eilers pushed buttons to acknowledge and reset the alarm, but the alarm did not clear. Soon thereafter, unusual and loud noises came from an area of the powerhouse below the control room. Seconds later, additional alarms sounded and emergency lighting came on. Mr. Petersdorf left to investigate the source of the noises, and returned minutes later to report a fire at a lower level of the powerhouse. Smoke from the fire began to fill the control

room.   Mr. Eilers called 911 and evacuated the power-
house.

In the days following the fire, Mr. Greg Morris, a su-
pervisor, allegedly told Mr. Eilers:  "No, don't go into the
power plant.  It's not safe."  Early in the morning of June
20, however, Mr. Shindelus instructed Mr. Eilers to enter
the powerhouse and retrieve a key needed to reset the
head gate.   Mr. Eilers complied.   Later that day, Mr.
Eilers, without instruction, allegedly reentered the pow-
erhouse to check the scroll case pressure.

The Detroit Dam fire gave rise to two reports evaluat-
ing the incident:  an Army Regulation (AR) 15-6 investi-
gation report and a Board of Investigation (BOI) report.
The purpose of an AR 15-6 report is to create a record for
use in disciplinary actions.  AR 15-6 §§ 1-1 to 1-9.  Con-
versely, a BOI report is for accident prevention purposes
and cannot be used as evidence in disciplinary actions.
AR 385-10 § 3-28.  Mr. Eilers had access to the AR 15-6
report.  Although Mr. Eilers obtained a copy of a "nearly
final" draft of the BOI report, he was denied access to the
final version of the BOI report.

After the completion of the AR 15-6 and BOI investi-
gations, the operations project manager of the Detroit
Dam issued a Notice of Proposed Removal for Mr. Eilers.
In his response to the proposed removal, Mr. Eilers re-
ferred to portions of the draft BOI report.  On September
15, 2008, Mr. Dwane Watsek issued a Notice of Decision
on Proposed Removal, which removed Mr. Eilers from
employment.  In the decision, Mr. Watsek indicated that
he considered the contents of the BOI report only "to the
extent necessary to address [Mr. Eilers's] response and
clarify the facts."  J.A. 59.

Mr. Eilers's union initiated a grievance and the mat-
ter was taken to arbitration.  During the arbitration, Mr.

Eilers again sought access to the final BOI report. At the hearing, counsel for Mr. Eilers indicated that he thought the Army's refusal to give access to the final BOI report raised "a Constitutional violation issue." J.A. 1315. Thereafter, the union submitted the draft BOI report into evidence.

The arbitrator sustained Mr. Eilers's removal based on charges including the failure to reopen the XJ-5 breaker or cut off power to the plant after the alarm sounded, and the failure to take action to stop the flow of electricity, for example by opening the A320 main breaker, after the fire started. The arbitrator also sustained additional charges related to Mr. Eilers's behavior after the fire, including reentering the powerhouse without authorization after resetting the head gate, lack of candor regarding Mr. Morris's instructions not to enter the power plant, and lack of candor regarding entering the power plant after resetting the head gate. Arbitrator's Op. 9-17. Mr. Eilers now appeals the arbitrator's decision. We have jurisdiction pursuant to 5 U.S.C. § 7121(f) and 5 U.S.C. § 7703. *Martin v. Dep't of Veterans Affairs*, 412 F.3d 1258, 1263 (Fed. Cir. 2005).

## DISCUSSION

Mr. Eilers raises two issues on appeal. First, Mr. Eilers asserts that his due process rights were violated because the Army did not provide him with newly acquired evidence and an opportunity to respond. Second, he asserts that the arbitrator's decision was not supported by substantial evidence or otherwise not in accordance with the law. We address Mr. Eilers's arguments in turn below.

I

The federal statutory employment scheme creates a property interest in continued employment. *Stone v. FDIC*, 179 F.3d 1368, 1375 (Fed. Cir. 1999). Before being deprived of this property interest, a public employee must be given "notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). An "employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* An *ex parte* communication that introduces "new and material information to the deciding official will violate the due process guarantee of notice." *Stone*, 179 F.3d at 1377.

Whether there was a due process violation turns on "the facts and circumstances of each particular case." *Id.* Factors to be considered include whether the "communication merely introduces 'cumulative' information or new information; whether the employee knew of the error and had a chance to respond to it; and whether the *ex parte* communications were of the type likely to result in undue pressure upon the deciding official to rule in a particular manner." *Id.* There is no due process violation if the *ex parte* communication does not introduce new and material information. *Id.*

Mr. Eilers alleges that his due process rights were violated because Mr. Watsek, the deciding official, reviewed the final BOI report and spoke with BOI members individually prior to rendering his decision in this case. Mr. Eilers indicates that he was prejudiced because he was denied access to the final BOI report and "was not given an opportunity to consider their input in defending against the Agency action."

The government responds that, as an initial matter, there is no indication that Mr. Watsek used anything other than the draft BOI report in his decision and that because Mr. Eilers had the draft report he could not have been prejudiced. The government explains that Mr. Eilers had the opportunity to examine Mr. Watsek during the arbitration to obtain proof that his procedural due process rights were violated. Mr. Eilers's only citation to the record, however, is that Mr. Watsek had "read the BOI." Pet'r's Br. 17 (citing J.A. 1290-91). This testimony does not demonstrate Mr. Watsek reviewed the final BOI report, as opposed to the draft report. Likewise there is no evidence that indicates that Mr. Watsek received any new and material information from conversations with BOI members. Thus, there is no evidence that indicates that Mr. Watsek relied upon any new and material information which was not cumulative of the information Mr. Eilers already possessed (the draft BOI Report and the AR-15-6 Report).

Moreover, Mr. Watsek testified that, under normal circumstances, he would not consider a BOI Report in a disciplinary action and, in fact, Army Regulation 385-10 prevents the BOI report from being used as evidence in a disciplinary action. Mr. Watsek testified that he considered the BOI Report only to the extent necessary to address Mr. Eilers's "mischaracterizations from the BOI", but otherwise attempted to give the BOI report no weight in his decision. J.A. 1273; *see also* J.A. 59 (same). Thus, we have no basis to infer that Mr. Watsek considered information not in Mr. Eilers's possession. Without evidence that Mr. Watsek reviewed information not already in his possession, Mr. Eilers fails to establish any prejudice, and therefore has failed to establish any due process violation.

## II

This court reviews the decision of an arbitrator in a federal employment dispute under the same standard as if the dispute was decided by the Merit Systems Protection Board. 5 U.S.C. § 7121(f); *Martin*, 412 F.3d at 1263-64. We must affirm the decision of an arbitrator unless it was "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). "[T]he standard is not what the court would decide in a *de novo* appraisal, but whether the administrative determination is supported by substantial evidence on the record as a whole." *Parker v. U.S. Postal Serv.*, 819 F.2d 1113, 1115 (Fed. Cir. 1987). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McEntee v. Merit Sys. Prot. Bd.*, 404 F.3d 1320, 1325 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In addition, a "presiding official's credibility determinations . . . are virtually unreviewable." *Hambsch v. Dep't of Treasury*, 796 F.2d 430, 436 (Fed. Cir. 1986).

The arbitrator articulated the standard for negligent performance of duties as: "'A failure to exercise the degree of care required under the particular circumstances, which a person of ordinary prudence in the same situation and with equal experience would not omit.'" Op. 9, quoting *Velez v. Department of Homeland Security*, 101 M.S.P.R. 650, 656 (2006). Applying this standard to the facts, the arbitrator sustained two charges based on Mr. Eilers's actions on June 18, 2007: that Mr. Eilers failed to reopen XJ-5 or otherwise cut off power after the alarm sounded and that Mr. Eilers failed to take any action to stop the electrical energy after the fire started. Op. 12-14.

Mr. Eilers first argues that the Army did not establish that there was a standard of care that he failed to meet because there were no explicit instructions for the situation, no training for the situation, and no operating procedures in place detailing the emergency protocols. He characterizes the lack of formal instructions, training, and operating procedures as a "misguided hope that all employees should intuitively know what to do in the event of an emergency." Pet'r's Br. 26. Mr. Eilers also argues that the management of the Detroit Dam was confused as to the job functions and responsibilities of its employees. Mr. Eilers's arguments, however, are belied by his own testimony, which confirms the standard of care for dam operators is to de-energize a circuit that is causing a problem and de-energize electrical fires. We see no error in the arbitrator's application of this standard of care.

Mr. Eilers next argues that he did not breach the standard of care and acted as a reasonable operator would under the circumstances. Mr. Eilers first claims the arbitrator's finding that he failed to open the XJ-5 breaker was wrong. His primary evidence is a photograph taken days after the event, which showed the breaker opened. The arbitrator, however, gave the photograph no weight because "prior to the photograph being taken, the control room was not a secured site." Op. 13. The arbitrator instead considered evidence from a data monitoring system and credited Mr. Eilers's prior indication that he did not believe he opened the XJ-5 breaker. Op. 13. We conclude in light of this evidence and credibility determination that the arbitrator's factual findings are supported by substantial evidence.

Mr. Eilers also argues that even if he failed to open XJ-5, he still exercised the degree of care required because other operators would have acted similarly. He cites the testimony of various witnesses, which he claims

indicate that a reasonable operator would not have immediately reopened XJ-5 under the circumstances.  Even if these operators would not have *immediately* reopened XJ-5, one of these same witnesses testified that an operator would reopen the breaker upon determining there was still a fault, and another confirmed that an operator should try and open the breaker in order to save equipment.  Given this testimony, we conclude the arbitrator's findings are supported by substantial evidence.

Finally, Mr. Eilers disputes that his failure to stop the flow of electrical energy after the fire started was negligent.  He claims that when the emergency lighting came on, he concluded the A320 main breaker automatically opened and cut off the flow of electricity.  The arbitrator, relying on Mr. Eilers's previous indication that he "did not know what finally cleared the fault," though "[h]e thought A320 must have cleared at some point," J.A. 155, concluded that Mr. Eilers did not know that the A320 main breaker automatically opened.  The arbitrator also found that the A320 main breaker did not actually open until minutes after the emergency lighting came on. Op. 14.  In light of the evidence, we cannot overturn these fact findings.

Mr. Eilers further claims that a prudent operator would not have opened the A320 main breaker and cites testimony of witnesses including Mr. Shaw, the crew foreman.  Some of the witnesses relied upon by Mr. Eilers, however, testified that under the circumstances faced by Mr. Eilers, when they became aware of the fire below the power should be cut off by, e.g., opening A320.  Moreover, the arbitrator found there was a two minute delay between the time Mr. Eilers became aware of the fire and the time he called 911.  In light of this evidence, we conclude that the arbitrator's findings regarding negligent

performance of duties are supported by substantial evidence.

Mr. Eilers also attacks the arbitrator's findings regarding the charge of entering a hazardous area without authorization. While Mr. Eilers received authorization from Mr. Shindelus to enter the powerhouse to reset the head gate, the arbitrator found that Mr. Eilers subsequently reentered the powerhouse without any authorization and contrary to a direct order. First, Mr. Eilers claims that he did not reenter the prohibited area after resetting the head gate. The arbitrator, however, credited a note written by Mr. Shindelus a few weeks after the event that indicated Mr. Eilers did reenter the powerhouse on June 20, and that Mr. Shindelus neither instructed nor prohibited his reentry. In light of this note and credibility determination, the arbitrator's finding was supported by substantial evidence.

Second, Mr. Eilers disputes that he received an explicit instruction not to enter the powerhouse, and claims he merely overheard a conversation where Mr. Morris stated it was unsafe to enter. The arbitrator, however, found that Mr. Eilers was instructed not to enter the power plant. The record contains an email by Mr. Morris that he directly told Mr. Eilers: "No, don't go into the power plant. It's not safe." Op. 15; J.A. 320. Given this email, we cannot overturn the arbitrator's credibility determinations.

Mr. Eilers also argues that he did not lack candor in responding to investigatory questions. Since the arbitrator found Mr. Eilers was directed not to enter the powerhouse, and did in fact enter the powerhouse, the arbitrator's conclusion that Mr. Eilers lacked candor on these subjects during the investigation is also supported by substantial evidence.

We have considered Mr. Eilers's additional arguments on appeal and find them to be without merit.

**AFFIRMED**

COSTS

Each party shall bear its own costs.