NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**DWIGHT MAYBERRY,**
*Petitioner,*

v.

**DEPARTMENT OF DEFENSE
DEPENDENTS SCHOOLS EUROPE,**
*Respondent.*

---

2012-3014

---

Appeal from Petition for Review of an Arbitrator's Decision in FMCS Case No. 111118-51267-A by Jacqueline A. Imhoff.

---

Decided: January 7, 2013

---

RICHARD J. HIRN, Attorney at Law, of Washington, DC, argued for petitioner.

JANE W. VANNEMAN, Senior Trial Counsel, Commercial Litigation Branch, United States Department of Justice, of Washington, DC, argued for respondent. With her on the brief were STUART F. DELERY, Acting Assistant Attorney

General, JEANNE E. DAVIDSON, Director, and REGINALD T. BLADES, JR., Assistant Director.

––––––––––––––––––

Before RADER, *Chief Judge*, NEWMAN AND REYNA, *Circuit Judges.*

NEWMAN, *Circuit Judge.*

Mr. Dwight Mayberry was a first-grade teacher at the Schweinfurt Elementary School, a Department of Defense school located in Schweinfurt, Germany to serve children in the military community, primarily Army families stationed in the southeastern portion of Germany. After twenty-seven years of unblemished record, he was fired for "repositioning" four first-grade students in his classroom. That is the issue of this appeal.

Mr. Mayberry states that the penalty is disproportionate, that he was removed without notice that his disciplinary actions were disapproved, that his years of service and the many favorable reports and parental support were not considered, and that he offers every likelihood of corrective behavior. Although we believe that the courts should be reluctant to intrude into local school management, on the record before us the remedy of termination without opportunity to improve, in view of Mr. Mayberry's long and favorable record as a teacher in the first grade and his representations of ready correction is not supportable. The "Memorandum of Understanding" between DoDDS and the teachers states that "an educator's use of reasonable force to restrain a student is appropriate to prevent the student from harming himself or herself, harming others, or destroying property."

We reverse the dismissal, and remand to the agency for reinstatement and the application of guidelines relevant to the acceptable standards of discipline in a first-grade classroom.

BACKGROUND

When unruly children in his first grade class would slouch or fall off their chairs or otherwise be disruptive, and would not obey when Mr. Mayberry asked them to stop the disruption and sit up, he would lift the child by the upper arms to sit them up in their chairs. A child reported to his parents that his arm had been hurt by the lifting, and the parent told the school's principal. After investigation, Mr. Mayberry was fired. He was not previously warned that his disciplinary actions were disapproved, and was given no opportunity to change.

The record was that Mr. Mayberry had no prior disciplinary complaint. Throughout his teaching career he received favorable performance evaluations, and won numerous teaching awards. Over the years before these allegations, Mr. Mayberry's colleagues and supervisors—including the principal who later recommended his termination—described him in glowing terms. Some samples from the record are:

> I found Mr. Mayberry to be an effective manager of routines in a well-organized classroom. He often ate and interacted positively in his soft-spoken way with his students during lunch in the cafeteria.

> [Mr. Mayberry] continually strives to successfully implement DoDDS guidelines and curriculum standards . . . . Mr. Mayberry has a calming demeanor with his students. He has been challenged this year

by some of the more demanding students and has sought professional advice from his colleagues. I look forward to next year [with Mr. Mayberry].

Mr. Mayberry is a dedicated professional who has successfully met all critical performance elements . . . . As a result of his focused and supportive efforts, increased learning occurred for all students in his class . . . . Mr. Mayberry utilizes many motivational techniques and creates a supportive and productive educational environment for learning.

[Mr Mayberry] implements best practices in reading and communicates the criteria for expected performance . . . . Of particular note is his stellar success with several ESL students who began the year with little to no understanding of English and ended the year confident and greatly improved in their application of English usage in reading, writing, and speaking. In concert with the ESL teacher, he created a safe and supportive environment for language application. Mr. Mayberry is a model of professionalism and commitment to [his] students.

Mr. Mayberry is well regarded by students, staff, parents and administration and has very successfully met the critical performance elements.

Mr. Mayberry has exemplified the positive support expected of all staff regarding our school's goals for improved reading comprehension and adequate yearly progress for all students.

The parents of two of Mr. Mayberry's students had specifically requested that Mr. Mayberry teach their younger child

because his older brother "absolutely loved [Mr. Mayberry] as a teacher."

On January 27, 2010, eight-year-old AF's[1] mother called Wilma Holt, the school's principal. Ms. Holt stated that AF's mother said that AF "told her this morning that his teacher was hitting kids in the class" and had "hurt him too," by grabbing him by the upper arm. Ms. Holt promptly informed the military authorities including the Army's Criminal Investigation Division (CID). That afternoon Ms. Holt summoned Mr. Mayberry to her office, told Mr. Mayberry that there had been an allegation of child abuse against him, and put Mr. Mayberry on administrative leave pending the outcome of the CID investigation.

CID agents interviewed children from Mr. Mayberry's class, and their parents. Several children stated that Mr. Mayberry "grabbed," "yanked," "squeezed," "shook," or "hit" them when they misbehaved. Other children in the class related how much they liked Mr. Mayberry and looked forward to his class. For example, the parents of one student stated that their child "adored Mr. Mayberry and looked forward to going to school on a daily basis." Another parent stated that her son "is very fond of Mr. Mayberry and has never made any complaints" about him. Still other parents reported that their son "enjoys being in Mr. Mayberry's class and has never had any complaints;" these parents had "visited the classroom on many occasions and . . . never observed anything inappropriate."

On conclusion of the CID investigation, Principal Holt issued a notice of proposed removal. The notice describes four incidents of child discipline, called specifications.

---

[1]     The record uses initials to protect the children's identities.

According to the first specification, Mr. Mayberry squeezed AF's arms "really tight and/or picked him up (by the upper arm) and slammed him down in his seat." In the second specification, Mr. Mayberry "used force with JN when [Mr. Mayberry] picked him up by his arm/shoulder and pushed him down to a seated position at his desk." JN stated that this happened several times and caused his chest to hurt. In the third specification, Mr. Mayberry "grabbed GP by the chin and squeezed a little too tight." The fourth specification states that "[o]n multiple occasions during the school year, [Mr. Mayberry] used force with [JM, JL, TM, and OM], to include grabbing and/or picking them up by their arms and pushed them down to a seated position at their desks." This specification also states that Mr. Mayberry "hit TM on the neck with a ruler, causing her to suffer pain for two days."

Principal Holt fired Mr. Mayberry for "inappropriate touching of students." Ms. Holt stated that removal was appropriate "in light of the nature and seriousness of his offense, and its relation to his duties, position and responsibilities as a teacher." Superintendent Michael Thompson agreed. Mr. Thompson acknowledged that the collective bargaining agreement governing Mr. Mayberry's employment contemplates progressive discipline and an opportunity to correct unacceptable behavior, but stated that the "repeated, inappropriate touching of students is so egregious that removal is warranted, even if a first offense." The record before the arbitrator, discussed *post*, states that Mr. Mayberry admitted to physically repositioning four disruptive students. There is no record of a hearing at the agency.

Mr. Mayberry filed a grievance with the Department of Defense Dependents Schools (DoDDS). The Director of DoDDS-Europe denied the grievance, stating that Mr. Mayberry's "egregious" conduct, specifically his "manhan-

dling" of the students, "warrants immediate removal and does not allow for progressive discipline." The Director pointed out that, under DoDEA Regulation 5751.9, "removal is within the range of recommended penalties for a first offense of substantiated child abuse, and/or administering physical punishment, and/or using physical force to alter the behavior of a student." Mr. Mayberry proceeded to arbitration, as the agreement authorized. At the arbitration hearing he admitted to "repositioning" four intransigent students, but he did not admit to the more serious conduct charged by the school. The arbitrator upheld Mr. Mayberry's termination on the basis of Mr. Mayberry's admissions.

At the arbitration, Mr. Mayberry described the event involving AF as follows: He was teaching a math lesson, and the children were sitting on the floor in front of the chalkboard. AF began talking loudly. Mr. Mayberry asked him to stop numerous times, and asked him to move to a different part of the room. AF ignored Mr. Mayberry, kept talking, and refused to move. According to Mr. Mayberry:

> At that point I got up, I walked over to him, he is seated on the floor with his legs crossed. I took my hand, upper arm, I lifted him up, picked him up, took about two steps and sat him back down on another location on the floor.

AF did not complain when Mr. Mayberry moved him, although he complained to his parents that his arm had been hurt.

AF appeared before the arbitrator and testified that Mr. Mayberry "hurt kids" and "picked me up by the arm and then slammed me on the floor." AF stated that he did not remember how many times this occurred, but the incident

left a bruise on his arm. AF also testified that Mr. Mayberry "will push the chair when you are sitting at your desk and hurts your stomach." AF reported that he did not like Mr. Mayberry. The arbitrator determined that AF's testimony was unreliable, so she did not give it any weight in arriving at her decision.

As to the second specification, Mr. Mayberry admitted to repositioning JN in his chair, as a "last resort" when he was "annoyed" or "at the end of my rope." Mr. Mayberry explained that JN had severe behavioral problems, he was distracted easily, slouched down in his chair, fell out of his chair, and moved around a lot. Mr. Mayberry stated that he tried to encourage him, to use positive rewards, but sometimes nothing worked.

For the third specification, there was no evidence before the arbitrator that Mr. Mayberry grabbed or squeezed GP's chin. Respondent DoDDS so conceded. As to the fourth specification, Mr. Mayberry recalled repositioning JM and JL the same way he repositioned JN—exerting enough force to sit them up in their chairs. Mr. Mayberry denied touching or moving TM, and he did not recall moving OM.

In total, Mr. Mayberry admitted to physically repositioning four students during the 2009-10 school year. According to the arbitrator, that was enough for discharge:

> I find that physically moving or adjusting four children, three of them more than once, over a period of time warrants discharge even though this was the first time [Mr. Mayberry's] behavior was brought to the attention of the administration.

Numerous persons testified in support of Mr. Mayberry. One parent reported that her son "really liked Mr. May-

berry," "asked about him every day," and said "I want Mr. Mayberry back." This parent testified that Mr. Mayberry "was very nice, very helpful . . . and always was smiling . . . . [He was a] very good teacher." Her son had never seen Mr. Mayberry grab a student.

Another mother testified that "[w]e liked Mr. Mayberry as a teacher." She elaborated that:

> Mr. Mayberry did a great job with [our first son] and a great job of bonding with [him] and we had enjoyed him. [Our first son] absolutely loved him as a teacher. We felt he also would do well with [our second son].

She did not believe Mr. Mayberry committed the alleged abuse, and "hope[d] [Mr. Mayberry] would come back and be able to finish out the year."

The Schweinfurt pediatric dentist, who had a son in Mr. Mayberry's class and whose patients included 70-80% of Mr. Mayberry's students, testified that the students said they "liked" Mr. Mayberry and thought he was "nice" and "funny." This community dentist "never had any concerns" about Mr. Mayberry. He testified that "[t]he children who came into my office constantly reported that they liked Mr. Mayberry, enjoyed being in his class." He saw Mr. Mayberry's firing as "a loss of an asset" and "a loss to the community."

The teacher across the hall, who occasionally shared classes with Mr. Mayberry, testified that she "observed a very caring, consistent teacher" and saw nothing of concern when she visited his classroom. She was "very upset" to see Mr. Mayberry go. Ten to twelve of Mr. Mayberry's colleagues wrote character references on his behalf.

The arbitrator's decision to uphold the termination was based solely on the conduct to which Mr. Mayberry admitted. The arbitrator acknowledged that the collective bargaining agreement required notice and progressive discipline but, citing her concern for the safety of young children, stated that "some infractions are so serious as to justify termination for a first offense," giving as examples "slugging a supervisor" or "selling drugs on the premises." Apparently believing Mr. Mayberry's misconduct to be of similar magnitude, the arbitrator sustained the removal.

## DISCUSSION

When taking adverse action against a federal employee, the agency must establish (1) that a preponderance of the evidence supports the charged misconduct, (2) a sufficient nexus between the misconduct and the efficiency of the service, and (3) that the penalty imposed is reasonable in light of the facts and circumstances. *Malloy v. U.S. Postal Serv.*, 578 F.3d 1351, 1356 (Fed. Cir. 2009). In reviewing an agency's action, "[a]n arbitrator is bound to apply the same substantive legal standards as would the Merit Systems Protection Board ('MSPB')," *Martin v. Dep't of Veterans Affairs*, 412 F.3d 1258, 1264 (Fed. Cir. 2005), and judicial review of an arbitrator's decision is under the same standard governing appeals of MSPB decisions. 5 U.S.C. §7121(f); *Grigsby v. U.S. Dep't of Commerce*, 729 F.2d 772, 774 (Fed. Cir. 1984). Thus the arbitrator's action is affirmed unless it is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, (2) obtained without procedures required by law, rule, or regulation having been followed, or (3) unsupported by substantial evidence. 5 U.S.C. §7703(c).

Mr. Mayberry argues that agency rule requires progressive discipline and an opportunity to change, and that the

penalty of immediate termination, in light of his highly favorable and lengthy record and commendations, is so disproportionate as to be an abuse of discretion. "[T]he discipline imposed by an agency will not be upheld where that discipline is so harsh that it is unconscionably disproportionate to the offense and amounts to an abuse of discretion." *Swentek v. United States*, 658 F.2d 791, 796 (Ct. Cl. 1981).

There must be a reasonable relationship between an employee's wrongdoing and the discipline imposed. In *Villela v. Department of the Air Force*, 727 F.2d 1574, 1576 (Fed. Cir. 1984), this court recognized that while "[t]he choice of penalty is generally left to agency discretion," deference is unwarranted if "the penalty is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion." In *Webster v. Department of the Army*, 911 F.2d 679, 685-86 (Fed. Cir. 1990), the court observed that a "grossly disproportionate" remedy should not be sustained. In *Mitchum v. Tennessee Valley Authority*, 756 F.2d 82, 84 (Fed. Cir. 1985), the court recognized a duty to ensure that "the agency has responsibly balanced the relevant factors in the individual case and selected a penalty within the tolerable limits of reasonableness." In *Gose v. United States Postal Service*, 451 F.3d 831, 836 (Fed. Cir. 2006), the court explained that an abuse of discretion occurs where the decision "represents an unreasonable judgment in weighing relevant factors."

According to the record, the arbitrator sustained the termination on the basis of Mr. Mayberry's admission that he physically "repositioned" four slouching, uncooperative students in the current school year. Although the school apparently referred to additional disciplinary actions that it said had occurred over two years, the arbitrator did not mention them. As stated in *Quinton v. Department of*

*Transportation*, 808 F.2d 826, 829 (Fed. Cir. 1986), the court "will scrutinize carefully the appropriateness of the penalty imposed" if "many of the original charges are not sustained below."

The arbitrator held that Mr. Mayberry's admitted repositioning of four unruly students in his first grade classroom warranted discharge, even though this was Mr. Mayberry's first complaint in twenty-seven years. As noted *supra*, many parents, students, and colleagues provided letters and testimony on his behalf, stating that they consider him a wonderful teacher and an asset to the school. The school's policy and the collective bargaining agreement require progressive discipline if rehabilitation is feasible. However, the DoDEA regulations state that, "[u]sing physical force to alter the behavior of a student" may result in removal, even for a first offense. DoDEA regulations reflect the understanding that "[t]here are many disciplinary situations and a wide variety of penalties. In deciding which action to take, careful judgment must be used so that the penalty is not out of proportion to the character of the offense, especially a first offense." What Mr. Mayberry did, physically sitting-up students in their chairs and moving an unruly student sitting on the floor, is indeed a use of physical force, but the nature of the force and the entirety of the circumstances must be considered. It is not disputed that there was no notice to Mr. Mayberry that his actions were unacceptable, and no opportunity for him to cease this behavior. *See Swentek*, 658 F.2d at 796 (discussing reasonableness of the penalty in light of all the circumstances).

We do not doubt that some offenses warrant immediate discharge; however, the arbitrator's examples of "slugging a supervisor" or "selling drugs" are not comparable. On the arbitrator's findings, Mr. Mayberry was fired for physically repositioning several disruptive students, when they would

not follow his instructions to sit in their chairs or stop talking.

We do not hold that the school should not have intervened promptly, on learning of behavior that it deemed improper. However, on the facts on which the arbitrator relied, the remedy of termination, without prior notice of disapproval and without opportunity to improve, was not reasonable in view of the weighty record of glowing statements from many parents and students, and a history of commendations for excellence. The termination is reversed. We remand to the agency with instructions to withdraw the termination, and to provide sufficient instruction as to acceptable classroom discipline.

**REVERSED and REMANDED.**