NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**BRENDAN CORKERY,**
*Petitioner*

**v.**

**DEPARTMENT OF HOMELAND SECURITY,**
*Respondent*

---

2015-3216

---

Petition for review of an arbitrator's decision in No. FMCS 13-02672-6 by Roger P. Kaplan.

---

Decided: January 4, 2017

---

MICHAEL WILSON MACOMBER, Tully Rinckey PLLC, Albany, NY, for petitioner.

ELIZABETH ANNE SPECK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., SCOTT D. AUSTIN; JILL M. SKRENTY-PACKARD, United States Customs and Border Protection, Buffalo, NY.

---

Before O'MALLEY, WALLACH, and TARANTO, *Circuit Judges.*

PER CURIAM.

Brendan Corkery appeals from an arbitrator's decision following the arbitration between the American Federation of Government Employees, Local 2724 ("the Union") and the Department of Homeland Security, U.S. Customs and Border Protection ("the Agency") with respect to Corkery's removal from his position as a Border Patrol Agent ("BPA"). Because substantial evidence supports the arbitrator's decision, we *affirm*.

## BACKGROUND

Corkery began work for the Agency as a BPA in December 1997, and was transferred to the Erie Border Patrol Station in June 2009. BPAs at Corkery's level (GS-1896-12) perform demanding duties related to intelligence collection and utilization, and also may be required to perform physically strenuous tasks. The Agency also required Corkery to qualify and show proficiency with a government-issued firearm.

In 2012, several of Corkery's coworkers made statements explaining that Corkery had exhibited odd and concerning behavior while on duty. Several BPAs provided written statements complaining about Corkery's body odor in the gym and while patrolling. Other agents noted that Corkery talked to himself, sometimes in nonsensical sentences. A BPA reported witnessing an incident in which Corkery had what appeared to be human feces on his leg while in the workplace locker room. Other BPAs witnessed Corkery leave communal shower facilities tracking what appeared to be human feces across the locker room floor. Based on these observations, Agency management ordered Corkery to attend a fitness-for-duty evaluation and placed Corkery on administrative leave pending the results of the evaluation.

Corkery attended the physical evaluation portion of the fitness-for-duty evaluation in November 2012. The physical evaluation did not reveal a medical condition explaining the odd behavior Corkery's colleagues observed, and the reviewing medical official recommended that Corkery undergo a psychiatric evaluation.

Dr. Jeffrey Grace, an independent medical examiner and board-certified psychiatrist, conducted a psychiatric evaluation of Corkery in December 2012. As part of a complete assessment of Corkery, Dr. Grace administered the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") psychiatric assessment to Corkery. Dr. Richard Frederick, a licensed clinical psychologist, scored Corkery's MMPI-2 assessment. Based on his analysis and the results of Corkery's MMPI-2 assessment, Dr. Grace diagnosed Corkery with "Psychotic Disorder NOS."[1] Dr. Grace found that Corkery's prognosis was "guarded" and the severity of his illness was "significant." Dr. Grace further concluded that Corkery likely suffered from psychotic symptoms such as auditory hallucinations. The functional implication of Corkery's responses to such hallucinations, according to Dr. Grace, meant that Corkery's "judgment, in a comprehensive way, is significantly

---

[1] Psychotic Disorder NOS "is a psychotic disorder that does not meet the criteria, or there is conflicting information, for the diagnosis of a specific psychotic disorder." J.A. 87. "An unspecific psychotic disorder occurs when the psychotic symptoms though present do not meet all the diagnostic criteria for a specific psychotic disorder such as schizophrenia." J.A. 87 n.2. At the arbitration hearing, Dr. Grace explained that "NOS" stands for "not otherwise specified," and this diagnosis reflects a "category of illness where there is clearly psychotic illness but it's not delineated in any of the other more formal diagnosis [sic]." J.A. 224.

impaired and he is not able to safely and effectively function as a Border Patrol Agent." J.A. 120–21.

Dr. Paul Prunier, the Agency's board-certified psychiatric consultant, reviewed Dr. Grace's psychiatric assessment and Dr. Frederick's interpretation of the MMPI-2 results. Given the severity of Corkery's symptoms, Dr. Prunier concurred with Dr. Grace's assessment and concluded that Corkery was psychiatrically unfit for any form of duty.

Dr. Grace later submitted an addendum discussing Corkery's limitations and restrictions. In this report, Dr. Grace again noted Corkery's diagnosis of "Psychotic Disorder NOS," stated that Corkery's prognosis was guarded, and restated his opinion that Corkery's illness was significant. Dr. Grace again opined that Corkery could not safely or effectively perform several of the specific duties of a BPA. Dr. Prunier reviewed Dr. Grace's addendum and agreed that Corkery was psychiatrically unfit for duty.

Based on the medical opinions of Drs. Grace, Frederick, and Prunier, the Agency concluded that Corkery was unfit for duty, and proposed removing him from his position as a BPA. The Agency notified Corkery by letter of this decision in April 2013. Corkery and his representative responded to the letter orally and in writing. In support, Corkery submitted results of a psychiatric evaluation conducted by Dr. Jay Supnick, a licensed psychologist. Dr. Supnick's report reflected more favorably on Corkery's mental condition than did the reports commissioned by the Agency.

The Agency asked Dr. Prunier to review Dr. Supnick's report. Dr. Prunier concluded that he did not agree with Dr. Supnick's findings—and further noted that at no point in his report did Dr. Supnick conclude that Corkery was fit for duty. Dr. Prunier recommended that Dr. Frederick review Dr. Supnick's report, particularly Dr. Supnick's

psychological testing of Corkery and his results. Dr. Frederick criticized Dr. Supnick's methods and concluded that Dr. Supnick's testing reached "essentially the same outcome obtained in the evaluation conducted by Dr. Grace." J.A. 141. After reviewing Dr. Frederick's report, Dr. Prunier issued a final report and recommendation in June 2013, concluding that, based on his review of all medical documentation including Dr. Supnick's report, Corkery was psychiatrically not fit for duty.

The deciding official, U.S. Border Patrol Chief Patrol Agent (Buffalo Sector) Brian Hastings ("Hastings"), sustained the Agency's proposal to remove Corkery. Given the medical reports and the risks and responsibilities of the BPA position, Hastings concluded that he had no option but to remove Corkery from service. Corkery's removal became effective on June 14, 2013.

On July 3, 2013, the Union invoked arbitration on behalf of Corkery pursuant to Article 34 of the parties' controlling collective bargaining agreement. The arbitrator held hearings on October 7 and 8, 2014, and February 3, 2015. Contemporaneously with the filing of its closing brief, the Union filed a motion for sanctions alleging, among other things, that the Agency failed to produce a memorandum prepared by BPA Edward Hess in December 2012 ("the Hess memorandum") related to Hess's observations of Corkery on the day of the first feces incident mentioned above. In the Hess memorandum, Hess explains that, after speaking to Corkery in the locker room, another BPA asked Hess if he noticed anything unusual about Corkery. Hess told that BPA that he had not.

On July 2, 2015, the arbitrator upheld the Agency's removal of Corkery. The arbitrator also denied the Union's motion for sanctions, concluding that there was no evidence that the Agency deliberately withheld the Hess memorandum and that the information in the Hess

memorandum was not key to the removal decision.
Corkery appeals these determinations. We have jurisdic-
tion to adjudicate a petition for review of an arbitrator's
decision pursuant to 5 U.S.C. § 7121(e)(l) and 5 U.S.C.
§ 7701(a). Corkery timely appealed under 5 U.S.C.
§ 7703(b)(l).

## DISCUSSION

We review the arbitrator's decision under 5 U.S.C.
§ 7121(f), which establishes that arbitrations of such
grievances are reviewed under the same standard of
review that applies to appeals from Board decisions. 5
U.S.C. § 7121(f); *see also Cornelius v. Nutt*, 472 U.S. 648,
652 (1985). Section 7703(c) requires this court to set aside
"any agency action, findings, or conclusions found to be
(1) arbitrary, capricious, an abuse of discretion, or other-
wise not in accordance with law; (2) obtained without
procedures required by law, rule, or regulation having
been followed; or (3) unsupported by substantial evi-
dence." 5 U.S.C. § 7703(c). As to element (3), substantial
evidence is "such relevant evidence as a reasonable mind
might accept as adequate to support" the Board's conclu-
sion. *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305
U.S. 197, 229 (1938).

An agency may remove an employee "only for such
cause as will promote the efficiency of the service." 5
U.S.C. § 7513(a). We sustain an employee's discharge if it
is supported by a preponderance of the evidence. 5 U.S.C.
§ 7701(c)(1)(B). Where an employee occupies a position
with medical standards or physical requirements and the
finding that he was unable to perform was based on
medical history, the agency is required to show the follow-
ing to establish a charge of inability to perform: "[1] the
condition at issue is itself disqualifying, [2] recurrence
cannot medically be ruled out, and [3] the duties of the
position are such that a recurrence would pose a reasona-
ble probability of substantial harm." 5 C.F.R. § 339.206.

At the outset,[2] Corkery argues that the arbitrator failed to cite to a legal standard in his decision, or alternatively, that the arbitrator failed to apply the correct standard in making his determination.  But it is substance, rather than form, which guides our review of arbitrators' decisions. *Martin v. Dep't of Veterans Affairs*, 412 F.3d 1258, 1264 (Fed. Cir. 2005); *see Girani v. Fed. Aviation Admin.*, 924 F.2d 237, 242 (Fed. Cir. 1991); *Wissman v. Soc. Sec. Admin.*, 848 F.2d 176, 178 (Fed. Cir. 1988).  Further, the arbitrator identified the legal standard when he stated that "the Agency proved by *preponderant evidence* that Corkery was not fit for duty as a BPA.  Corkery was removed for just and sufficient cause.  His removal promoted the efficiency of the service."  J.A. 50 (emphasis added).

The arbitrator's determination finds support in the testimony of multiple BPAs who expressed concern about Corkery's behavior.  The arbitrator acknowledged that no BPA actually witnessed Corkery defecating on himself, and further that some of the memoranda offered by BPAs had inaccuracies.  J.A. 42.  The arbitrator concluded, however, that the testimony about the defecation incidents was credible, as were the reports of Corkery's body odor and observations of Corkery talking to himself and appearing to respond to internal stimuli.  J.A. 48–49.  "Credibility determinations are within the discretion of the arbitrator and are virtually unreviewable on appeal." *Raney v. Fed. Bureau of Prisons*, 222 F.3d 927, 939 (Fed. Cir. 2000).

The arbitrator's determination is further supported by the medical testimony of Drs. Grace and Prunier, who

---

[2]    Corkery challenges whether he should have been required to undergo a Fitness for Duty Examination.  Corkery failed to raise this issue as part of the arbitration, and thus has waived it.  J.A. 2–3.

both concluded that Corkery was unfit for duty. Dr. Grace explicitly stated that, based on his testing and examination of Corkery, "[w]ithin reasonable medical certainty, [Corkery] is not able to safely and effectively perform any of the duties of the position, including, but not limited to, working considerable amounts of overtime and responding to emergencies in a law enforcement capacity." J.A. 120. Dr. Grace also stated that Corkery has "psychotic symptoms, very likely auditory hallucinations" and that Corkery could not safely and effectively function as a BPA. J.A. 120. Dr. Prunier concurred with this determination, finding that, "[g]iven the severity of [Corkery's] current psychiatric symptoms, it appears [he] should focus his attention on getting well, and not engage in any form of even light-duty function." J.A. 125.

The arbitrator properly exercised his discretion to determine that the testimony of Dr. Supnick was less probative in Corkery's case than the testimony of Drs. Grace, Frederick, and Prunier. Dr. Supnick's opinion did not reach the conclusion that Corkery is fit for duty, nor did Dr. Supnick testify to this effect at the arbitration hearing. Further, the arbitrator discounted Dr. Supnick's testimony, in part, because Dr. Supnick failed to acknowledge that he administered a "practice" MMPI-2 to Corkery before administering the "real" test, a method the arbitrator characterized as unacceptable. Dr. Frederick also criticized Dr. Supnick's testing methods as improper. In addition, Dr. Prunier explained that Dr. Supnick's report contained many of the same conclusions Drs. Grace and Frederick reached—in particular, that Corkery was defensive during his psychiatric examinations.

The arbitrator reasonably concluded that Corkery failed to offer credible explanations for his behavior. Corkery's explanation for the alleged feces on his leg changed over time, as did his explanations for whether and how he talks to himself.

The arbitrator reasonably concluded that the Agency properly removed Corkery from service. The Agency possesses substantial discretion in choosing an appropriate action once the Agency's underlying charge has been sustained. *See LaChance v. Devall*, 178 F.3d 1246, 1251–52, 1260 (Fed. Cir. 1999). Although the Agency applies the factors outlined in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981) in most cases, they do not apply here because the Agency removed Corkery based on medical, rather than disciplinary, reasons. *See Lisiecki v. Merit Sys. Prot. Bd.*, 769 F.2d 1558, 1566–67 (Fed. Cir. 1985).

During the arbitration hearing, Hastings addressed in detail his review of all relevant evidence in making his decision. Hastings examined the job requirements for a BPA and concluded that, based on the evidence before him, Corkery could not perform the essential functions of the job or any light duty position. Further, Hastings noted that Corkery had not sought treatment for his condition.

Corkery also has failed to show harmful error as to the alleged withholding of the Hess memorandum. Harmful error is "error by the agency in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error." 5 U.S.C. § 7701(c)(2)(A). To show harmful error, Corkery must demonstrate that the error "caused substantial harm or prejudice to his [] rights." *Id.* The arbitrator concluded that the Agency did not deliberately withhold the Hess memorandum, and further, the Agency did not rely upon the Hess memorandum in reaching its decision to remove Corkery. J.A. 35–39. The Hess memorandum states that Hess did not notice anything "unusual" about Corkery that day. This memorandum, according to the arbitrator, did not contradict the report of one of the BPAs who reported seeing feces on Corkery's leg on the same day.

J.A. 36–38. We conclude that the Hess memorandum does not undermine the testimony of the other BPA, both because the arbitrator found the BPA's testimony on the feces incident to be credible and because Corkery has not denied that some substance was on his leg on the day in question.

We have considered Corkery's other arguments, and find them to be without merit. The arbitrator considered the evidence presented by both parties and found a preponderance favoring the Agency's position. Corkery has failed to show that the arbitrator's decision contained reversible error under § 7703(c). We therefore *affirm* the arbitrator's decision.

## AFFIRMED

### COSTS

No costs.